ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| Precision Standard, Inc. ) | ASBCA Nos. 58135, 58205 |
| ) | |
| Under Contract No. SPM4A7-08-M-9187 ) | |

APPEARANCES FOR THE APPELLANT:      Nancy M. Camardo, Esq.
                                    Kevin M. Cox, Esq.
                                     Camardo Law Firm, P.C.
                                     Auburn, NY

APPEARANCES FOR THE GOVERNMENT:     Daniel K. Poling, Esq.
                                     DLA Chief Trial Attorney
                                    Edward R. Murray, Esq.
                                     Trial Attorney
                                     DLA Aviation
                                     Richmond, VA

OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN
ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

These appeals arise from a contract awarded by the Defense Logistics Agency to
Precision Standard, Inc. (PSI). The parties have cross-moved for summary judgment.
We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C.
§§ 7101-7109. We grant the government's motion in part and otherwise deny the
motions.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

1. On 30 April 2008, the Defense Supply Center Richmond (DSCR), now DLA
Aviation (DLA), awarded Contract No. SPM4A7-08-M-9187 (hereinafter the contract) to
PSI. The contract required the manufacture and delivery of 138 aircraft skins for the
A-10 aircraft at a price of $395 per skin. The total price of the contract, including the
separately-priced first article, was $57,010. Inspection/Acceptance was to take place at
origin at PSI's plant in Ferndale, Michigan. The delivery point was the Defense Depot at
San Joaquin, Tracy, California (DDJC). The contract was administered by the Defense
Contract Management Agency (DCMA). (R4, tab 1 at 1, 7-8, 13)

2. The skins are made of layers of material held together by resistance spot welds.
They are not stiff or rigid, but are somewhat pliable. They are used to line the inside of
the engine cowling and are mounted about 10 inches in front of the fan blades. Each skin

covers 180 degrees of the circumference inside the cowling, and together a pair of skins will cover the entire 360 degree arc inside the cowling. Given their location, the skins are subject to significant levels of vibration, force, and pressure. If the skins, and particularly the welds holding the material layers in place, were to fail, pieces could be sucked into the aircraft engine with catastrophic results. (Gov't Statement of Undisputed Material Facts (GSUMF) ¶¶ 2-3)

3. The contract required PSI to deliver a first article to the Engineering Support Activity (ESA) at Hill Air Force Base (Hill AFB) 200 days after award or by 16 November 2008. ESA had 120 days in which to evaluate the first article. The price of the first article was $2,500. (R4, tab 1 at 2-4, 9, 13-14)

4. The production quantity consisted of 138 skins. Contract line item number (CLIN) 0001 consisted of 108 skins and CLIN 0002 consisted of 30 skins. Both CLINs required delivery 200 days after approval of the first article. (R4, tab 1 at 2, 7-9)

5. Drawing No. 160D411002 Rev M, dated 10 June 1997, was the main (basic) drawing for the skins and is also the part number for the skins. Note 3 of the drawing required spot welding to be done in accordance with specification A-F401. (R4, tab 1 at 6, tab 46 at 1)

6. On 25 October 2010, the government released Engineering Order (EO) 10A1244, amending Drawing No. 160D411002, as follows:

> 20. DESCRIPTION OF CHANGES/REMARKS
>
> This EO is to insure that the spot welds are radiographically inspected to find cracks resultant of manufacture before they are allowed to propagate in usage.
>
> A. CHANGE NOTE 3 IN DRAWING NOTES AS FOLLOWS:
>
> WAS
>
> 3. SPOTWELD PER A-F401. LOCATION OF SPOTWELD TO BE +/- .12
>
> IS
>
> SPOTWELD AND RADIOGRAPHICALLY INSPECT SPOTWELDS IN ACCORDANCE WITH A-F401 AND

> AWS D17.2.... LOCATION OF SPOTWELD TO BE
> +/- .12

(R4, tab 47)

7. Paragraph 4.7.1.1 of AWS D17.2, entitled "Visual Discontinuities in Test Specimens," required the welds to be "free of cracks" (R4, tab 7 at 13). Paragraph 4.7.2, entitled "Radiographic Acceptance Criteria," required at paragraph 4.7.2.1 that "[a]ll welds....be free of cracks" (*id.* at 15). Paragraph 5.2.2.6 of AWS D17.2, entitled "Visual and Radiographic Requirements," stated that "[r]adiographic examinations...shall not be required, unless otherwise specified in the applicable drawing or part specification" (*id.* at 21).

8. The contract incorporated the following Federal Acquisition Regulation (FAR) clauses by reference, each providing in pertinent part as follows:

> FAR 52.233-1, DISPUTES (JUL 2002)
>
> ....
>
> (i) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer.
>
> FAR 52.243-1, CHANGES—FIXED-PRICE (AUG 1987)
>
> (a) The Contracting Officer may, at any time, by written order...make changes within the general scope of this contract....
>
> ....
>
> (b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.
>
> FAR 52.246-2, INSPECTION OF SUPPLIES—FIXED-PRICE (AUG 1996)
>
> ....

3

(k) Inspections and tests by the Government do not relieve the Contractor of responsibility for defects or other failures to meet contract requirements discovered before acceptance. Acceptance shall be conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract.

FAR 52.247-34, F.O.B. DESTINATION (NOV 1991)

(b) The Contractor shall—

....

(4) Be responsible for any loss of and/or damage to the goods occurring before receipt of the shipment by the consignee at the delivery point specified in the contract.

FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984)

(a)(1) The Government may...terminate this contract...if the Contractor fails to—

(i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;

(ii) Make progress, so as to endanger performance of this contract.... or

(iii) Perform any of the other provisions of this contract....

The contract also included a DSCR local clause as follows:

FAR 52.246-9G01, WARRANTY OF SUPPLIES OF A NON-COMPLEX NATURE DSCR (MAY 2001)

(a) Definitions: "Acceptance," as used in this clause, means the act of an authorized representative of the Government by which the Government assumes for itself, or as an agent of another, ownership of existing supplies.... "Supplies," as used in this clause, means the end items

4

furnished by the Contractor and related services required under the contract....

(b) Contractor's Obligations.

(1) Notwithstanding inspection and acceptance by the Government...the Contractor warrants that at time of delivery:

(i) All supplies furnished under this contract will be free from defects in design, material or workmanship and will conform with the requirements of this contract; and

(ii) The preservation, packaging, packing, and marking, and the preparation for, and method of, shipment of such supplies will conform with the requirements of this contract.

....

(c) Remedies Available to the Government:

(1) The Contracting Officer shall give written notice to the Contractor of any breach of warranties...within one year from the last delivery under the contract.

(2) Within a reasonable time after the notice, the Contracting Officer may either –

....

(ii) Retain such supplies and reduce the contract price by an amount equitable under the circumstances.

(3)(i) If the contract provides for inspection of supplies by sampling procedures, conformance of supplies or components subject to warranty action shall be determined by the applicable sampling procedures in the contract.

(R4, tab 1 at 12-15, tabs 42-43)

9. The first article was to be delivered within 200 days after contract award, or by 16 November 2008 (SOF ¶ 3). For reasons that are not apparent from the record, PSI did not ship the first article and first article test report to DLA until 7 September 2010. The first article test report stated, among other things, that the first article was manufactured in accordance with the technical data package, Drawing No. 160D411002 and A-F401. (R4, tab 11 at 7)

10. Ms. Jerri C. Stuart, the designated DCMA quality assurance representative (QAR), recommended approval of the first article on 7 September 2010:

1. Material meets all requirements of the contract, drawings and specifications.
2. Material meets all the requirements of the applicable special process and Quality Assurance Requirements (QARs).
3. Material meets all the requirements of the contractor (or Government) testing provisions.
4. Recommend Approval of the FAT.

(R4, tab 11) QAR Stuart gave the first article a "Pass" on workmanship (R4, tab 11).

11. The contract required PSI to submit a welding certificate with the first article (R4, tab 1 at 3). Since there was no mention of spot welding in any of the inspection reports, job travelers or other documents accompanying the first article, the government requested PSI to provide a welding certificate on 13 October 2010 (R4, tab 13 at 1-2). On 14 October 2010, PSI submitted a "Certificate of resistance spot weld" dated 20 August 2010, which stated as follows:

This is to certify that above mentioned part has been spot welded in accordance with A-F401 and AMS-W-6858 Class A.

(R4, tab 13 at 33, tab 14 at 2)

12. On 6 December 2010, the government issued Modification No. P00001, conditionally approving the first article and extending the delivery date for the 138 production units from 3 October 2009 until 24 June 2011 (R4, tab 2). The conditional approval by First Article Program Manager Tammy Hamel, dated 29 November 2010, noted that no certification for spot welding was initially received and that there was no mention of spot welding in any inspection report, job traveler, etc. These discrepancies were required to be corrected in production and the conditional approval specifically requested that the appropriate DCMA QAR ensure that the discrepancies were corrected

6

on the production items. The conditional approval further stated that the approved first article was not to be used as a manufacturing standard and that production items must meet the contract requirements. (R4, tab 14)

13. On 19 May 2011, based on information received from PSI, DCMA issued a "Delay Notice," advising cognizant personnel that PSI would not deliver the entire quantity of 138 skins on the 24 June 2011 due date (R4, tab 16). Rather, PSI estimated it would complete 40-50 skins by that date (*id.*).

14. By 3 August 2011, PSI had shipped 70 skins:

> -Shipment PSI0002: 10 skins on 10 May 2011
> -Shipment PSI0003: 10 skins on 25 May 2011
> -Shipment PSI0004: 10 skins on 20 June 2011
> -Shipment PSI0005: 15 skins on 12 July 2011
> -Shipment PSI0006: 15 skins on 25 July 2011
> -Shipment PSI0007: 10 skins on 3 August 2011

(R4, tab 58 at 7, tab 59 at 7, tab 61 at 7, tab 62 at 7, tab 63 at 7, tab 64 at 7)

15. DCMA QAR Stuart signed off on the production parts prior to shipment via Electronic Data Interchange (GSUMF ¶ 24). According to the government, DCMA QARs do not have to personally inspect parts before signing for their release and there is no evidence in the record that Ms. Stuart personally inspected these shipments (*id.*). PSI contends that the government has not affirmatively established that QAR Stuart did not personally inspect the parts since there is no declaration from her in the record (app. stmt. of genuine issues of material fact ¶ 24). The record does contain an email from Ms. Stuart to counsel for PSI stating that "PSI['s] surveillance was in great shape which would mean that I would not have inspected at all their shipments going out" (R4, tab 69).

16. PSI was responsible for shipping the skins to the DDJC and for any loss or damage prior to their arrival at DDJC (GSUMF ¶ 9; SOF ¶ 1). Mr. Shad Winter, a distribution facilities manager at DDJC, described DDJC's intake procedures as follows:

> 6. ...When documenting inspection origin shipments received, DDJC...compare[s] the documentation to the property received. They pay very close attention to any special markings.... They conduct a visual inspection of one bare item [to] validate the part number and National Stock Number. A visual verification of the general physical appearance of all packages and specific characteristics of the bare item is conducted....

7

7. ...DDJC [also] performs a visual damage inspection.... There is no record of any [damage to these shipments and there is no evidence] of any special handling instructions....

8. [T]he items [are stored] in the same boxes in which [they are shipped[,] placed on a pallet, [and] stored in a storage rack location. Each...rack will only hold one pallet.

(GSUMF, ex. 5, decl. at 3)

17. DDJC received the parts shipped by PSI on the following dates:

- 10 on 18 May 2011
- 10 on 1 June 2011
- 10 on 29 June 2011
- 15 on 20 July 2011
- 15 on 1 August 2011
- 10 on 8 August 2011

(GSUMF ¶ 28)

18. Upon request, DDJC shipped the skins to its customers, one of which was the DLA Distribution Depot at Hill AFB (GSUMF ¶ 31). Mr. Marlin Zachry, Jr., senior program manager for URS, a service contractor that operates the depot (GSUMF ¶ 32), described the depot's intake and handling procedures as follows:

4. Upon receipt...we performed a kind, count and condition (KCC) inspection of the material but would not have gone to the bare item on each box unless there was evidence of tampering or damaging. These boxes were not damaged or had any evidence of tampering....

5. If URS employees had noticed any damage to any of the shipments or boxes...we would have generated a Transportation Discrepancy Report (TDR) or Supply Discrepancy Report (SDR) as appropriate. There is no record of any TDR or SDR being submitted for any of these shipments.

6. These items were in the original manufacture pack when received and we stored the items in the same boxes in which

8

the material was initially shipped.... The items were transported [from DDJC] via a commercial carrier, and once receipted into our inventory, they were moved to one of our buildings for storage via our internal fleet. Neither am I aware, nor is there any evidence, that these boxes were flattened during the receipt and storage process.

(GSUMF, ex. 4, decl. at 2)

19. On 16 June 2011, the 309th Air Force Maintenance Wing at Hill AFB issued a Product Quality Deficiency Report (PQDR) finding "Bad Spot Welds" on an aircraft skin delivered by PSI. The PQDR stated that "SPOT WELDS ARE DAMAGED/PULLED THROUGH." (R4, tab 60 at 1-3; GSUMF ¶ 40)

20. On 22 June 2011, Mr. John A. Martinez, a mechanical engineer who acted as an aerospace engineer for the 416th Supply Chain Management Squadron at Hill AFB, was asked to investigate the PQDR (GSUMF ¶ 43, ex. 1, ¶ 1). His declaration stated, in part, as follows:

4. After reviewing the PQDR issued by the mechanics, I visited the maintenance line.... A high number of welds in the part the mechanics showed me had visible defects. Of the many visible defects, the most prominent defects were the spot welds. The spot welds were very deep and had star like patterns in the actual weld nuggets. This type of pitting is generally a good indicator that there are problems with the spot welds especially knowing that these spot welds are held to "Class A" welding requirements.

5. Since this PQDR part had such a high number of visibly bad spot welds, I then decided to inspect the skins [in stock at the depot]. There were 8 parts in stock in the depot at that time. These skins showed signs of visible cracking in the spot welds similar to the part I reviewed on the maintenance line. The parts appeared to be in their original packaging, with each part bagged and packaged in an individual box. I did not notice any damage to any of the boxes. There was nothing about either the parts or the boxes which indicated they had been damaged, crushed, or flattened. I do not recall seeing any special handling procedures, such as fragile, this side up, etc., printed anywhere on the boxes.

(GSUMF, ex. 1 at 2)

9

21. Mr. Martinez then requested that Mr. Anthoney Harrison, program manager for the Conformance and Verification Program (CVP), inspect and test all the skins in stock at the depot (GSMUF ¶ 45, ex. 2). Mr. Harrison's declaration provides, in part, as follows:

> 8. I requested...that the depot provide me with the parts in stock at the depot [from PSI]. I learned that there were 16 such parts. The 16 parts arrived at the CVP office on July 28, 2011. They appear to have arrived in the same boxes in which they were shipped by the contractor. The boxes did not appear to be damaged in any way. There were no handling instructions on the boxes, such as this side up, fragile, or handle with care.
>
> 9. On August 2, 2011, John Martinez and I met to discuss how to inspect and test the parts. We discussed the AF-401 spot welding inspection criteria identified in the contract and the fact that this required compliance with the visual and radiographic inspection requirements in AWS D17.2. We decided that I would conduct a visual inspection of the spot welds on the parts, and then forward them for radiographic inspection at the Non-Destructive Inspection (NDI) Laboratory at Hill....
>
> 10. On August 3, 2011, I removed the parts from the boxes and performed a visual inspection of the 16 parts. I was careful to maintain the contour of the parts and avoid flexing them. Every single part I reviewed had multiple instances of cracking in the paint at the spot welds. ...I decided to allow them to be radiographically tested as we had planned. Not only would this provide further information about the defects, it would allow us to determine whether the cracks were only in the surface paint or in the spot welds themselves.

(GSUMF, ex. 2 at 2-3)

22. Radiographic testing was completed and Mr. Ward Fong, program lead for NDI Laboratory, met with Mr. Harrison on 9 August 2011 to discuss the results of the tests. According to Mr. Fong:

> Every single one of the x-ray images showed a significant number of cracked spot welds. Not only were cracks clearly visible in the spot welds marked with the lead arrows [the

10

welds identified by Mr. Harrison as showing cracks upon visual inspection], virtually all of the other spot welds also contained cracks....

(GSUMF, ex. 3, ¶ 5)

23. On 9 August 2011, the government issued unilateral Modification No. P00002 (Mod 2), stopping work due to defective welds (R4, tab 3).

24. On 5 October 2011, DLA contracting officer (CO) Heather Gomez sent a Notice of Revocation of Acceptance and Breach of Warranty to PSI's president, Mr. Everett Casey. The notice stated, in part, as follows:

> [T]his letter serves as written Notice of Breach of Warranty pursuant to Clause 52.246-9G01.... Rather than terminating your contract for default, I have decided to allow you a chance to replace the 70 defective parts you shipped (at your cost) pursuant to the warranty clause. However, to ensure that these and remaining contract quantities are not defective, I am creating a special testing CLIN 9910 with a delivery date of January 04, 2012. You shall submit 2 each samples to Hill AFB.... Once Hill AFB has tested the samples for compliance with the contract requirements, including using x-ray examinations as required, you may deliver the remainder of the quantities under the contract.

(R4, tab 26)

25. On 6 October 2011, the DLA contracting office issued Modification No. P00003 (Mod 3) to the contract, which added the special test CLIN referenced in CO Gomez's letter and extended the contract delivery dates:

> REVISED DELIVERY SCHEDULE IS AS FOLLOWS:
> SPECIAL TEST CLIN SUBMITTAL DATE: 90 DAYS, 01/04/2012
> TESTING/EVALUATION DATE: 120 DAYS, 05/04/2012

Upon completion of these tasks, the delivery date for the production units was to be extended from 24 June 2010 until 20 November 2012. (R4, tab 4)

26. On 7 October 2011, the government issued Modification No. P00004 (Mod 4), lifting the stop work order and directing PSI to "[p]roceed with production with the delivery schedule on modification P00003" (R4, tab 5).

27. PSI responded in a letter dated 12 October 2011, requesting "the prompt issuance of a further mod in the identified contract to clarify...the Contractor's duties and responsibilities" following CO Gomez's 5 October 2011 letter and Mods 2, 3, and 4. PSI specified that:

> The mod is properly to:
>
> 1. Report that the 35 parts referred to in the noted October 5, 2011 letter (a) are not disapproved, that (b) there is no "Revocation of Acceptance" thereof, that (c) there is no charge of "Breach of Warranty" as to those parts, that (d) those parts will not be returned, and that (e) the contractor has no duty to supply a Fed Ex number for such return.
>
> 2. Report that the additional Clin 9910 Special Test and the "Clin 3 for a 68 ea (warranty items) at no cost to the government" set forth in P000[0]3 are now void and withdrawn.
>
> 3. Report that the delivery schedule for the remaining production parts is to be "11/20/2012" as set forth in P000[0]3.

(R4, tab 27) PSI provided no explanation or rationale in the letter for its position (*id.*).

28. On 25 October 2011, CO Gomez responded, declining to rescind Mod 3 and observing that "it appears that you are refusing to comply with Modification P000[0]3. You are hereby notified that the Government considers this a condition which is endangering performance of the contract." She called for PSI to provide the government with adequate assurances of performance within 10 days, or "the Government may terminate this contract for default." (R4, tab 29)

29. On 18 November 2011, CO Gomez emailed a copy of the cure notice to PSI, reminding PSI that she had not yet received a response (R4, tab 30). There is no indication in the record that PSI ever responded to this second communication.

30. On 20 January 2012, after the due date for delivery of the two test items (4 January 2012) had passed without any delivery by PSI, and PSI still had provided no response to CO Gomez's requests for adequate assurances, CO Gomez sent PSI yet another letter via email and U.S. mail, providing PSI yet another chance to provide adequate assurances of performance and requesting PSI to provide a date by which it would deliver the two delinquent test items to Hill AFB. CO Gomez further noted:

12

I am aware that you have recently informed DCMA that you believe that the defective items were damaged by flattening during shipment or storage. The Air Force organization which performed testing on the defective material finds that this explanation could not account for the extensive damage to the parts it reviewed. It also noted that the original countours [sic] of the parts were still intact when the x-rays were performed.... [I]n any event, the purpose of the special test CLIN was to allow you an opportunity to demonstrate that you can adequately produce the part. Yet you appear to be refusing to submit these test parts.

(R4, tab 34)

31. On 30 January 2012, Mr. Jeremy Lee Wilczewski, PSI's senior project manager, responded, *in toto*, as follows:

Ms. Gomez,
This contractor deems that P000[0]4 dated Oct 7, 2011 to override the previous P000[0]2 and P000[0]3. The remaining balance of production items will be delivered by 11/20/2012 as stated in Mr. Casey's letter dated 10/12/11.

(R4, tab 35)

32. On 23 March 2012, DLA Terminating CO Susan E. Perkins terminated the contract for default based on PSI's failure to perform in accordance with the terms and conditions of the contract (R4, tab 36 at 7).

33. On 19 June 2012, DLA CO Janice A. Hicks issued a final decision (COFD), debt determination, and demand for repayment of funds pursuant to the Warranty clause in the amount of $13,825.00 (35 units @ $395/unit) (R4, tab 37). The amount demanded was subsequently reduced to $6,320.16 (16 units @ $395/unit) (App. Rev. Statement of Undisputed Material Facts (ASUMF), ex. 17).

34. On 9 May 2012, PSI timely appealed the termination for default to this Board. We docketed the appeal as ASBCA No. 58135 on 14 May 2012. PSI timely appealed DLA's breach of warranty claim COFD on 26 June 2012. We docketed that appeal as ASBCA No. 58205 on 2 July 2012.

DECISION

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1371 (Fed. Cir. 2014); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus,* 812 F.2d at 1390-91. However, more than mere assertions of counsel are necessary to counter a motion for summary judgment. The non-movant may not rest on its conclusory pleadings, but must set out, in affidavit or otherwise, what specific evidence could be offered at trial. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984). The parties' cross-motions are evaluated on their own merits, and we are not obliged to grant judgment as a matter of law for one side or the other. *Mingus*, 812 F.2d at 1391. On cross-motions, "counsel are deemed to represent...that all the relevant facts are before the [Board] and a trial is unnecessary." *Aydin Corp. v. United States*, 669 F.2d 681, 689 (Ct. Cl. 1982).

We address first the government's claim for breach of warranty due to the cracks in the welds. Visible cracks were discovered in the skins provided by PSI by government personnel working on the A-10 maintenance line (SOF ¶ 19). The government then further examined 16 PSI skins in stock using the visual and radiographic acceptance standards in AWS D17.2. The radiographic testing revealed multiple cracks in most welds in all of the samples (SOF ¶ 22). The government attributes the cracks to improper spot welding during PSI's manufacturing process. PSI argues both that the cracking was caused by government mishandling of the aircraft skins after delivery and that the government erred in radiographically inspecting the skins under AWS D17.2, when the standard incorporated into the contract was AMS-W-6858 Class A.

The government asserts that AWS D17.2 was applicable to PSI's contract. It explains that the specification referenced in the main drawing for the part (Drawing No. 160D411002), namely MIL-W-6858, was superseded by AMS-W-6858, which itself was superseded by AWS D17.2 in November 2007 (GSUMF ¶ 4, ex. 1, ¶ 8, ex. 2, ¶ 5). Thus, AWS D17.2 was the applicable standard at the time PSI's contract was awarded in April of 2008 (GSUMF ¶ 5). However, the government further asserts that even if AMS-W-6858 had been the applicable standard, it contains similar visual and radiographic inspection requirements as AWS D17.2: (1) visually, AMS-W-6858 states "cracks open to the surface in Class A welds must be limited to 0%" while AWS D17.2 requires that welds "shall be smooth, free of cracks, tip-pickup, pits, and other flaws; (2) radiographically, AMS-W-6858 calls for welds to be "free of cracks and flash," while

14

AWS D17.2 requires that "[a]ll welds shall be free of cracks and expulsion" (GSUMF ¶¶ 5-6 nn.1-2).

PSI counters that AWS D17.2 was not incorporated into the contract and that the applicable standard was AMS-W-6858. PSI relies for this assertion on the fact that the contract specifically calls out Specification A-F401 Amendment C dated 10 February 1988 (which version actually incorporates MIL-W-6858, not AMS-W-6858). (ASUMF ¶¶ 10-11; R4 tab 1 at 6, tab 21 at 3) PSI also takes issue with the government's assertion that the requirements of the two standards are essentially the same, insisting that AWS D17.2 is more stringent than AMS-W-6858 and that the government is quoting from the provisions in the latter standard that pertain to test welds, rather than the ones pertaining to production items (app. mot. at 10). PSI cites to the visual and radiographic criteria of AMS-W-6858 (Jul 1999) and states that the government has failed to substantiate that its skins failed to comply with those requirements (ASUMF, ex. 16 at 27-28, 31).

We find that there is a dispute of material fact with respect to the applicable welding standard, at the very least. Further development of the record is necessary, and we deny the parties' cross-motions for summary judgment as to ASBCA No. 58205, the warranty claim.

As to ASBCA No. 58135 (PSI's appeal of the termination for default), TCO Perkins based her final decision terminating the contract for default on PSI's failure to perform in accordance with the terms and conditions of the contract (SOF ¶ 32). The 23 March 2012 memorandum for record prepared by CO Gomez recounts the following:

- PSI's initial rejection of Mod 3 on 12 October 2011 (*see* SOF ¶ 27)
- PSI's failure to respond to the CO's cure notice dated 25 October 2011[1]
- The CO's 18 November 2011 email to PSI again requesting a response to the 25 October 2011 cure notice (SOF ¶ 29)
- PSI's failure to respond to the 18 November 2011 email (*id.*)
- CO Gomez's inquiry to Mr. Harrison whether the defects found in the 16 skins could have been caused by flattening during handling or storage (R4, tab 33)
- Mr. Harrison's response that storage and handling by the government did not cause the defects in the 16 skins (*id.*)

---

[1] PSI contends that its 5 January 2012 letter to DCMA constituted a response to the CO's October cure notice (app. stmt. of genuine issues of material fact ¶ 64). We reject this argument. Not only did PSI never send the CO a response, but its January letter concerned one skin sent to it for evaluation by DCMA and did not address the 16 skins inspected by government personnel that formed the basis for the issuance of Mod 3 and the CO's subsequent cure notice.

15

- CO Gomez's 20 January 2012 cure notice to PSI noting that the 4 January 2012 ship date for the two test skins required by Mod 3 has passed and PSI is now delinquent (SOF ¶ 30)
- PSI's 30 January 2012 letter which failed to provide a date by which the test skins would be shipped and stated that PSI "deems" Mod 4 to have overridden Mod 3 and Mod 2 and that PSI intended to deliver the balance of the production items by 20 November 2012 (SOF ¶ 31)

(R4, tab 36 at 3-5)

PSI does not dispute that it failed to deliver the two test samples required by Mod 3 or that it failed to offer adequate assurances of performance in response to the CO's repeated requests. Rather, it argues in opposition to the government's motion for summary judgment that the government's prior breach of the contract (by using test procedures inconsistent with the contract specifications) removed any obligation on its part to perform in accordance with the contract terms and conditions, including Mod 3. (App. opp'n at 2-3) Additionally, PSI argues in its motion for summary judgment that its failure to perform was caused by the government's improper warranty claim and was therefore excusable because it was beyond the control and without the fault or negligence of PSI (app. mot. at 19-21).

The undisputed facts demonstrate that the default termination was proper. *See Third Coast Fresh Distribution, L.L.C.*, ASBCA No. 59696, 16-1 BCA ¶ 36,340. On 5 October 2011, CO Gomez wrote PSI enclosing the report from Hill AFB 809th Maintenance Squadron on the inspection of 16 PSI skins in stock at the depot at Hill AFB which found both visible defects in the spot welds and cracks in a significant number of the spot welds on each of the 16 skins under radiographic analysis. Rather than terminate the contract for default, she offered PSI the opportunity to replace the defective skins already shipped after first submitting two samples for testing. (R4, tab 26) Mod 3, issued thereafter on 6 October 2011, called for delivery of the two test skins by 4 January 2012 (SOF ¶ 25). Based on the information she received in the report, CO Gomez acted reasonably in affording PSI the opportunity to demonstrate that its skins conformed to contract requirements rather than terminating for default.

The record reflects that the government's imposition of AWS D17.2 was done in the good faith belief that it was the correct standard (SOF ¶ 21). We have not found any evidence in the record before us that PSI raised the issue of breach by the government at the time Mod 3 was issued or at any time thereafter, prior to appealing the default termination. Nor did PSI assert any intention, after Mod 3 issued, to cease performance of the contract due to the government's putative breach. We also cannot find any evidence in the record that PSI ever discussed with the government at any time prior to the termination a concern that the wrong welding standard was being applied by the government in its inspections. Therefore, the government had no opportunity to address the issue with PSI. Rather, in response to Mod 3, PSI unilaterally announced that it intended to go forward

16

with the production and delivery of the remaining quantity of skins while ignoring the government's concerns with respect to the quality of the skins that had been delivered, the requirements of Mod 3 that were put in place to address those concerns, and the incipient, unresolved disagreement over the applicable welding standard.

Prior to issuing the second cure notice in January 2012, CO Gomez was made aware that DCMA had sent another skin (not one of the 16 the government inspected) to PSI for evaluation and that PSI had reported back to DCMA that the skin it was sent showed signs of having been flattened which it believed had caused the visible cracks. No radiographic analysis was performed on that one skin by PSI. (GSUMF ¶¶ 66-67) CO Gomez inquired of Mr. Harrison whether the cracks in the welds of the 16 skins could have been caused by improper storage or mishandling of the parts. Mr. Harrison responded that he had no knowledge as to the part sent to PSI, which he had never seen or inspected, but that none of the 16 skins he inspected had been flattened. Moreover, he relayed to her that the type of defects observed in the 16 skins were not the sort that would be caused by flattening, but rather by the welding process itself. (R4, tab 33; GSUMF ¶¶ 72-74)[2]

The contract's Disputes clause, FAR 52.233-1, requires the contractor to continue performance of the contract pending resolution of a dispute arising under the contract (SOF ¶ 8). Whether the proper version of welding standards was being applied, and the likely cause of the cracks in the welds, are just such disputes. Under the contract's Changes clause, for instance, PSI would have been entitled to compensation for any increased costs or delays occasioned by the government's insistence that it perform under a standard different from that contained in the contract, if such were determined to be the case. Whether or not such a dispute existed at the time PSI expressed its intention to ignore Mod 3 is questionable, since PSI had apparently not raised the issue. But, if it had, it would still have been required to perform in accordance with the contract's requirements and the reasonable direction of the CO. *Essex Electro Eng'rs, Inc.*, ASBCA No. 49115, 02-1 BCA ¶ 31,714 at 156,699 (citing *Benju Corporation*, ASBCA No. 43648 *et al.*, 97-2 BCA ¶ 29,274 at 145,654-55 (even if the government's interpretation is wrong, the contractor is not justified in refusing to do as directed, since the merits of the controversy have no effect on the requirement that a contractor continue performance)).

---

[2] Appellant objects to paragraphs 72-74, *inter alia*, of the government's SUMF on the basis that the declarations of Messrs. Martinez, Fong, and Harrison constitute improper expert testimony, but does not otherwise dispute the facts or opinions therein. We note that Federal Rule of Evidence 701 permits lay opinion testimony based on the witness's personal knowledge and experience, but in any event do not rely herein on the disputed opinions since we do not decide the warranty breach issue.

Relief was available under the contract should the government's belief that AWS D17.2 was the applicable standard turns out to have been mistaken. PSI's failure to perform was the result of its own acts and omissions and was not excusable.

## CONCLUSION

For the reasons stated, the government's motion for summary judgment in ASBCA No. 58135 is granted, and the parties' cross-motions for summary judgment in ASBCA No. 58205 are denied.

Dated: 8 June 2016

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58135, 58205, Appeals of Precision Standard, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals